# FILED

October 28, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE

| | | |
|---|---|---|
| JOHN M. CLINARD and<br>EDWARD CLINARD,<br><br>    Plaintiffs/Counter-Defendants/<br>    Appellees,<br><br>VS.<br><br>C. ROGER BLACKWOOD and<br>NANCY DODS BLACKWOOD,<br><br>    Defendants/Counter-Plaintiffs/<br>    Appellants,<br><br>VS.<br><br>AMERICAN LIMESTONE CO., INC.,<br><br>    Counter-Defendant/Appellee,<br><br>and<br><br>AUSTIN POWDER CO., INC.,<br><br>    Counter-Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Robertson Circuit<br>No. 8674<br><br><br>Appeal No.<br>01A01-9801-CV-00029 |

## APPEAL FROM THE CIRCUIT COURT FOR ROBERTSON COUNTY
## AT SPRINGFIELD, TENNESSEE

### THE HONORABLE WALTER C. KURTZ, JUDGE

For John M. Clinard and                        For C. Roger Blackwood and
Edward Clinard and                             Nancy Dods Blackwood:
American Limestone Co., Inc.:

Ames Davis
Paula D. Walker
Waller, Lansden, Dortch & Davis
Nashville, Tennessee

J. Clarence Evans
Winston S. Evans
Evans, Jones & Reynolds
Nashville, Tennessee

**REVERSED AND REMANDED**

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves the imputed disqualification of a Nashville law firm from continuing to represent a client with interests adverse to those of two former clients of one of the law firm's lawyers. Soon after discovering that their former lawyer had joined the law firm representing their adversaries, the former clients filed a motion in the Circuit Court for Robertson County seeking to disqualify their adversaries' law firm. The law firm conceded that the lawyer was personally disqualified but opposed disqualifying the entire firm by asserting that it had instituted a screening arrangement intended to shield the disqualified lawyer and his secretary from the rest of the firm. The trial court declined to disqualify the law firm but permitted the former clients to pursue an interlocutory appeal. We have determined that a screening arrangement will not prevent the disqualification of the law firm in this case. The disqualified lawyer had at one time served as his former clients' primary lawyer in the very lawsuit before the trial court and, therefore, had become heavily involved with the facts of the case and had directly received confidential information from his former clients. Accordingly, we reverse the order denying the motion to disqualify and remand the case with directions that the trial court enter an order disqualifying the plaintiff's law firm.

## **I.**

In the late 1960s, Maclin P. Davis, Jr., then a partner in the Nashville law firm of Waller, Lansden, Dortch & Davis, represented C. Roger Blackwood in a divorce proceeding. Thereafter, Mr. Davis represented Mr. Blackwood in other matters. After Mr. Blackwood married Nancy Dods Blackwood in 1973, Mr. Davis represented Ms. Blackwood as well.[1] In 1988, Mr. Davis joined the Nashville office of Baker, Donelson, Bearman & Caldwell, a large law firm with offices in six cities in Tennessee.[2] As far as this record shows, Mr. Davis continued to represent the Blackwoods in various matters following his lateral move between firms.

The Blackwoods own a farm in Robertson County that adjoins property owned by John M. and Edward Clinard. For many years, the Clinards leased their property to various companies that quarried limestone on the site. Two disputes arose between the neighbors after the Blackwoods began building a new home on their farm. First, Mr. Blackwood and John Clinard disagreed about the location of their boundary line.[3] Second, the Blackwoods asserted that blasting at the quarry had damaged their new house and stable. According to Mr. Blackwood, American Limestone Company, Inc. ("American Limestone") moderated the blasting and performed some clearing and excavation work for the Blackwoods after he complained about the blasting. However, the Blackwoods later asserted that the blasting at the quarry caused extensive damage to their house.

In February 1996, Mr. Blackwood repaired portions of the fence along Pepper Branch Creek that had sparked his earlier disagreement with John Clinard over the location of the boundary line. Two months later, the Clinards filed a declaratory judgment action against Mr. Blackwood in the Chancery Court for Robertson County seeking to establish the disputed boundary line. Mr. Blackwood retained Mr. Davis to represent him in the lawsuit.

On May 16, 1996, Mr. Davis formally entered an appearance in the case on behalf of Mr. Blackwood. Later, on June 24, 1996, Mr. Davis filed an answer and counterclaim against the Clinards asserting that the fence was the proper boundary line and requesting that the Clinards be enjoined from removing or damaging the fence. Mr. Blackwood and Mr. Davis also discussed filing a counterclaim and third-party claim against the Clinards and American Limestone for blasting damage to their property. However, Mr. Davis eventually informed Mr. Blackwood that he could not file a claim against American Limestone because the Baker, Donelson firm represented American Limestone in an unrelated environmental matter and because American Limestone had declined to permit Mr. Davis to represent interests adverse to the company's. Accordingly, on August 14, 1996, Mr. Davis withdrew as Mr.

Blackwood's lawyer and was replaced by Winston S. Evans.

On September 30, 1996, Mr. Evans filed an amended counterclaim and third-party claim on behalf of the Blackwoods against the Clinards and American Limestone. In this pleading, the Blackwoods sought damages from both the Clinards and American Limestone for negligent blasting, dumping a large amount of contaminated fill material on their farm, and polluting the air with dust from the quarry operations.[4] On October 29, 1996, Ames Davis and Waller, Lansden, Dortch & Davis entered an appearance on behalf of American Limestone. Approximately one month later, Ames Davis and Waller, Lansden, Dortch & Davis replaced the lawyer who had represented the Clinards from the outset of the litigation.

In June 1997, Mr. Davis left the Baker, Donelson firm and returned to Waller, Lansden, Dortch & Davis as a non-equity member of the firm. By that time, the Waller firm had grown to approximately one hundred lawyers. Upon Mr. Davis's return, the Waller firm implemented its "Conflict of Interest Screening Procedures" to prevent Mr. Davis and his secretary from communicating information concerning the Blackwoods' case to the other lawyers and staff of Waller, Lansden, Dortch & Davis.[5]

On August 12, 1997, soon after discovering that Mr. Davis had returned to the Waller firm, the Blackwoods' lawyer mailed a letter to Ames Davis stating that the Blackwoods did not assent to the Waller firm's representation of either the Clinards or American Limestone and requesting the Waller firm to withdraw from the pending lawsuit. Thereafter, on September 22, 1997, the Blackwoods filed a motion in the Circuit Court for Robertson County[6] seeking to disqualify Waller, Lansden, Dortch & Davis from continuing to represent the Clinards and American Limestone. The Waller firm opposed the motion. The trial court considered the motion based on affidavits without conducting an evidentiary hearing. On December 16, 1997, the trial court declined to disqualify the Waller firm but authorized the Blackwoods to

seek an interlocutory appeal. On January 14, 1998, this court granted the Blackwoods' Tenn. R. App. P. 9 application.

## II.

The practice of law has changed dramatically during the last half of the twentieth century. Greater numbers of lawyers practice in firms rather than as sole practitioners or in small associations.[7] The number and size of these law firms have grown at an accelerating pace,[8] and much of this growth has been accomplished through mergers and the lateral hiring of experienced lawyers.[9] In this environment, the generation of revenue and the maximization of profit have become important, if not primary, drivers of the law firm's culture.[10]

At the same time that the structure and size of firms have been changing, so have the career goals and attitudes of lawyers themselves. As late as twenty years ago, it was not uncommon for lawyers to spend their entire career with the law firm that hired them right out of law school. Today, there is increased mobility among lawyers, and it is not uncommon for associates and even partners to change firms several times during their career because of mergers or firm restructuring or because they desire to increase their personal income by creating new firms.[11] It is also becoming common for law firms to hire temporary lawyers to work a particular piece of business with no expectation of continued employment once the business is completed.

The changes in the legal profession have also been accompanied by changes in the relationships between law firms and their clients. In today's competitive, cost-conscious environment, clients wield more power than they once did. Clients are now more conscious of the cost of legal services. Rather than remaining with a single lawyer or law firm as they once did,[12] clients today will frequently shop around for legal services or will look to in-house attorneys to provide these services. Because of the increased complexity of the legal matters facing clients and the growing specialization among lawyers, it is also quite common for clients to be

represented by more than one lawyer or law firm at any given time.

These changes in the legal landscape, whether they be lamented or welcomed, have had a tendency to generate more conflict of interest problems than ever before. [13] These problems have placed a strain on the ethics rules governing the conduct of lawyers. The bench and the bar have realized that the traditional rules must be adapted to provide practical solutions for the problems currently facing lawyers and clients. The profession is now engaged in the process of formulating functional rules that give proper weight to the differing, and sometimes competing, interests of all parties concerned. Thus, the traditional core professional values of client loyalty, the preservation of a client's confidences and secrets,[14] and the avoidance of the appearance of professional impropriety[15] are being re-examined in light of prospective clients' interest in retaining a lawyer of their choice and the legitimate prerogative of lawyers to enhance their ability to earn a livelihood in their chosen profession.[16] Agreement concerning the proper way to balance these potentially competing interests has proven to be elusive, and, even today, the legal profession has yet to reach a consensus on many important issues.[17]

Among the most intransigent ethics issues currently confronting the profession involves the use of screening arrangements to avoid the imputed disqualification of an entire law firm because of a single member's conflict of interest with a former client. For the past twenty-five years, lawyers and judges have debated whether and in what circumstances screening arrangements should be allowed. This case requires us to revisit this issue at a time when the organized bar in Tennessee is exerting increasing pressure on the courts to permit the use of screening arrangements to avoid the seemingly harsh effects of imputed disqualification.[18]

The propriety of using screening arrangements has precipitated a pointed debate among practicing lawyers, judges, and academicians. Those favoring the use of screening arrangements insist that they are an appropriate way to protect clients' free access to lawyers of their choice and to facilitate lawyer mobility without

sacrificing client confidentiality.[19]  Those opposing the use of screening arrangements insist that the profession's ancient obligation to protect a former client's confidences should not be diluted by lawyers' pragmatic business interests.[20]  Even the most cursory examination of the literature on the subject reveals that the debate over the use of screening arrangements by lawyers in private practice is far from settled and that the prospects of an early consensus are guarded.

The Tennessee Supreme Court has yet to provide an authoritative interpretation of Tenn. S. Ct. R. 8, DR 5-105(D), and the Tennessee Bar Association has yet to present its proposed rules to the Court.  Thus, Tennessee's bench and bar must await the Court's definitive guidance concerning the viability of screening arrangements by lawyers in private law firms.  Based on the facts of this case, we have determined that the screening arrangement employed by Waller, Lansden, Dortch & Davis for Mr. Davis and his secretary cannot prevent the disqualification of the entire firm.  Mr. Davis became deeply involved in the facts of this case when he served as the Blackwoods' primary lawyer.  Accordingly, it is virtually certain that Mr. Davis obtained significant confidential information from the Blackwoods while he was representing them and that this information could, if divulged either purposefully or accidentally, cause material adverse effects on the Blackwoods in the present litigation.

### III.

We recognize at the outset that the most authoritative sources for the principles needed to decide this case are the rules and opinions of the Tennessee Supreme Court.  The Court has the exclusive power to regulate the conduct of lawyers in Tennessee.  *See In re Petition of Burson*, 909 S.W.2d 768, 773 (Tenn. 1995); *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984); *see also* Restatement (Third) of the Law Governing Lawyers § 1 cmt. c (Proposed Final Draft No. 2, 1998).  All lawyers, upon admission to the bar, become officers of

the Court, *see Andrews v. Bible*, 812 S.W.2d 284, 291 (Tenn. 1991); *Ward v. Alsup*, 100 Tenn. 619, 739, 46 S.W. 573, 574 (1898), and thereby become subject to the power of the Court to prevent and punish professional misconduct. *See Memphis & Shelby County Bar Ass'n v. Vick*, 40 Tenn. App. 206, 214, 290 S.W.2d 871, 875 (1955).

Early in our history, the courts fashioned the rules governing both the practice of law and the conduct of lawyers from common-law principles and from their own understanding of the practice of law and the role of lawyers in litigation. In the early part of this century, however, the organized bar, motivated to some degree by self-interest[21] began to play a more active role in regulating the conduct of lawyers by adopting ethics codes for the profession.[22] These codes, for the most part, reflected the rules and principles that had been fashioned by the courts over the years.[23] Accordingly, the rules in the organized bar's early ethics codes virtually mirrored the judicial decisions regarding lawyer conduct.

As time went by, the courts began to cite the organized bar's ethics codes as authority for their decisions regulating the conduct of lawyers. In time, the judiciary's reliance on ethics codes thoroughly blurred the line between the use of ethics codes for disciplinary purposes and the use of ethics codes to regulate lawyers' conduct during litigation.[24] Eventually, some courts adopted a restrained approach leaving the enforcement of ethics codes to the bar's existing disciplinary machinery. *See, e.g.*, *Armstrong v. McAlpin*, 625 F.2d 433, 445-46 (2d Cir. 1980), *vacated on other grounds*, 449 U.S. 1106 (1981). Other courts have rejected this "hands off" approach in favor of addressing directly unethical conduct occurring in connection with pending litigation. *See, e.g.*, *In re American Airlines*, 972 F.2d 605, 611 (5th Cir. 1992). Tennessee's courts have not hesitated to rely on ethics code provisions to protect the integrity of the judicial process or the rights of litigants when an ethical violation taints or threatens to taint a trial's fairness. *See Woodside v. Woodside*, No. 01A01-9503-PB-00121, 1995 WL 623077, at *8 (Tenn. Ct. App. Oct. 25, 1995) (Koch, J., concurring), *perm. app. denied concurring in results only* (Tenn. Jan. 8,

1996) (describing the judicial resolution of five issues using the Code of Professional Responsibility).

Ethics codes were never intended to supplant the court-created principles of professional conduct or to prevent the courts from continuing to refine and apply these principles. For the good of the profession, the courts have a continuing obligation to safeguard the attorney-client relationship and to maintain the public's confidence in the integrity of the legal system. *See Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F. 2d 1564, 1576 (Fed. Cir. 1984); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982); *In re Estate of Waters*, 647 A.2d 1091, 1098 (Del. 1994); *Ciaffone v. Eighth Judicial Dist. Court*, 945 P.2d 950, 953 (Nev. 1997); *Kala v. Aluminum Smelting & Refining Co.*, 688 N.E.2d 258, 262 (Ohio 1998).

In 1908, the American Bar Association adopted its first ethics code known as the Canons of Professional Ethics. The Tennessee Bar Association adopted the first thirty-two of these canons in 1909,[25] but the Tennessee Supreme Court did not place its imprimatur on these canons until 1938.[26] Even since 1938, the Tennessee Supreme Court has patterned its rules governing the conduct of lawyers after the ethics codes drafted by the American Bar Association.[27]

The Code of Professional Responsibility, as adopted by the Tennessee Supreme Court, has the force and effect of law. *See Gracey v. Maddin*, 769 S.W.2d 497, 504 (Tenn. Ct. App. 1989) (Koch, J., dissenting); *King v. King*, No. 89-46-11, 1989 WL 122981, at *11 (Tenn. Ct. App. Oct. 18, 1989) (Koch, J., concurring) (No Tenn. R. App. P. 11 application filed).[28] However, the Code of Professional Responsibility is itself divided into Canons, Ethical Considerations, and Disciplinary Rules, and each of these divisions has different authoritative weight. The Canons are "statements of axiomatic norms" that "embody the general concepts from which the Ethical Considerations and the Disciplinary Rules are derived." The Ethical Considerations are "aspirational in character and represent objectives toward

which every member of the profession should strive." Finally, the Disciplinary Rules are "mandatory in character" and state "the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *See* Tenn. S. Ct. R. 8, Preamble.

The Tennessee Supreme Court is the chief arbiter of the meaning of its own rules. *See In re Gant*, 937 S.W.2d 842, 846 (Tenn. 1996). However, in 1981, the Court reluctantly empowered[29] the Board of Professional Responsibility and its disciplinary counsel to issue formal and informal advisory ethics opinions construing the Court's own ethics rules. *See* Tenn. S. Ct. R. 9, § 26, West Publishing Co., Tennessee Decisions 609-614 S.W.2d at cxxxv. The formal ethics opinions, which only the Board may issue, "constitute a body of principles and objectives upon which members of the bar can rely for guidance in many specific situations." Tenn. S. Ct. R. 9, § 26.4(a).[30] However, even though formal ethics opinions are binding on the Board and the person requesting the opinion,[31] they are not binding on the courts. *See In re Youngblood*, 895 S.W.2d 322, 325 (Tenn. 1995); *State v. Jones*, 726 S.W.2d at 519-20. Nonetheless, formal ethics opinions can provide guidance to the courts because they reflect the legal profession's considered opinions regarding the appropriate standards of practice. *See King v. King*, 1989 WL 122981, at *12 (Koch, J., concurring).

## IV.

The parties have presented starkly different portrayals of the legal profession's current attitude regarding screening arrangements. On one hand, Waller, Lansden, Dortch & Davis asserts that screening arrangements in the private sector have become generally accepted and are currently being widely used; while the Blackwoods assert that screening arrangements have fallen into disfavor. Both parties are, at least in part, correct. There is, however, currently no consensus among the members of the legal profession concerning the necessary ingredients of screening arrangements or the circumstances in which a screening arrangement may

be used to avoid the consequences of the imputed disqualification doctrine.

**A.**

**The Conflict of Interest Rules**

The fiduciary relationship between a lawyer and a client requires the lawyer to exercise the utmost good faith to protect the client's interests. *See Alexander v. Inman*, 974 S.W.2d 689, 693-94 (Tenn. 1998); *Fitch v. Midland Bank & Trust Co.*, 737 S.W.2d 785, 789 (Tenn. Ct. App. 1987). Lawyers must preserve their client's confidences and secrets, exercise independent judgment on their client's behalf, and represent their client zealously within the bounds of the law. *See* Tenn. S. Ct. R. 8, Canons 4, 5 & 7; *Dyer v. Farley*, No. 01A01-9506-CH-00229, 1995 WL 638542, at *5-6 (Tenn. Ct. App. Nov. 17, 1995) (No Tenn. R. App. P. 11 application filed). They must also avoid serving two clients whose interests are adverse to each other. *See State v. Locust*, 914 S.W.2d 554, 557 (Tenn. Crim. App. 1995).

The prohibition against serving two masters is enforced using conflict of interest rules developed by the courts long before the organized bar began adopting ethics codes. *See* Restatement (Third) of the Law Governing Lawyers § 1 cmt. b, at 3 (Proposed Final Draft No. 2 1998). Many of the conflict of interest rules have now been incorporated into the organized bar's ethics codes. *See Henriksen v. Great Am. Sav. & Loan*, 14 Cal. Rptr. 2d at 186; Hamilton & Coan, *supra* note 20, at 66; Restatement (Third) of the Law Governing Lawyers, Forward, at xxiii-xxiv (Proposed Final Draft No. 1, 1996).

A conflict of interest arises whenever a lawyer is placed in a position of divided loyalties - a circumstance in which a lawyer's regard for the duty owed to one client tends to lead to disregard of the duty owed to another client. *See State v. Tate*, 925 S.W.2d at 552. To avoid conflicts of interest, lawyers are prohibited from undertaking to represent a client whose interests are adverse to those of one of the lawyer's other clients. *See State v. Phillips*, 672 S.W.2d 427, 430-31 (Tenn. Crim.

App. 1984); *Autry v. State*, 1 Tenn. Crim. 95, 98, 430 S.W.2d 808, 809 (1967).

These conflict of interest prohibitions continue to govern a lawyer's conduct after he or she is no longer representing a client. *See Mills v. Crane*, No. 66, 1987 WL 9165, at *4 (Tenn. Ct. App. Apr. 10, 1987), *perm. app. denied* (Tenn. July 27, 1987); *American Nat'l Bank v. Bradford*, 28 Tenn. App. 239, 262, 188 S.W.2d 971, 981 (1945); Tenn. S. Ct. R. 8, EC 4-6.[32] In fact, they continue after the death of a client or former client. *See* Restatement (Third) of the Law Governing Lawyers § 112 cmt. 2, at 280 (Proposed Final Draft No. 1 1996). Therefore, a lawyer may not represent interests materially adverse to those of a former client if the subject matter of the new representation is substantially related to the subject matter of the previous representation. *See State v. Hoggett*, No. 01C01-9003-CR-00073, 1990 WL 172632, at *2 (Tenn. Crim. App. Nov. 9, 1990) (No Tenn. R. App. P. 11 application filed); *Mills v. Crane*, 1987 WL 9165, at *5.

The application of the conflict of interest prohibitions to individual lawyers is relatively straightforward. A lawyer must not simultaneously represent two or more persons who have adverse interests in the same subject matter. *See* Tenn. S. Ct. R. 8, DR 5-105(A), EC 5-15; *State v. Tate*, 925 S.W.2d at 552. Likewise, a lawyer must not switch sides during an ongoing dispute. *See Henriksen v. Great Am. Sav. & Loan*, 14 Cal. Rptr. 2d at 187; *Straub Clinic & Hosp. v. Kochi*, 917 P.2d 1284, 1290 (Haw. 1996); *State ex rel. Freezer Servs., Inc. v. Mullen*, 458 N.W.2d 245, 249 (Neb. 1990); *Kala v. Aluminum Smelting & Refining Co.*, 688 N.E.2d at 266. Finally, a lawyer cannot undertake to represent a client with interests adverse to those of a former client. *See Mills v. Crane*, 1987 WL 9165, at *4.

## B.
### The Imputed Disqualification Doctrine

The growth in the number and size of law firms and the increased career mobility of lawyers have created new dimensions to conflict of interest problems.

In addition to the primary disqualification rules applicable to individual lawyers, secondary or imputed disqualification rules became necessary to deal with lawyers practicing in a firm setting. Developing and refining the principles for imputed disqualification has not been an easy task.

Simply stated, the doctrine of imputed disqualification provides that if the conflict of interest rules require the disqualification of an individual lawyer, then all that lawyer's professional colleagues are likewise disqualified. *See Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures, Inc.*, 224 F.2d 824, 826 (2d Cir. 1955); Bateman, *supra* note 8, at 254; Hamilton & Coan, *supra* note 20, at 73; Lee A. Pizzimenti, *Screen Verite: Do Rules About Ethical Screens Reflect the Truth About Real-Life Law Firm Practice?*, 52 U. Miami L. Rev. 305, 310 (1997). This principle is based on common sense assumptions concerning the way lawyers work in a firm setting, including the personal and financial relationships among members of a law firm and the motivations for firm members to share information and to support each other's efforts.[33] It is also premised on the common-law rule that partners are deemed to be agents of one another.[34]

The essential component of the imputed disqualification doctrine is the presumption that lawyers associated in a law practice, as agents of one another, know what the other lawyers in the firm know. *See* Penegar, *supra* note 9, at 848. Thus, it is presumed that information regarding a client that has been imparted to one member of a law firm has been shared with, and is known by, the other members of the firm. *See State v. Claybrook*, 1992 WL 17546, at *8. When a client's confidence and secrets are involved, this presumption is commonly referred to as the presumption of shared confidences.

By 1969, the doctrine of imputed disqualification had become so widely accepted that the American Bar Association included it in the Code of Professional Responsibility.[35] *See* Model Code of Professional Responsibility DR 5-105(D) (1969). The American Bar Association broadened the 1969 version of DR 5-105(D) in 1974 to require imputed disqualification of affiliated lawyers whenever an

individual lawyer becomes disqualified under any disciplinary rule. *See* Model Code of Professional Responsibility DR 5-105 (1974).[36] The 1974 version of DR 5-105(D) is currently part of Tennessee's Code of Professional Responsibility. *See* Tenn. S. Ct. R. 8, DR 5-105(D).[37]

The imputed disqualification doctrine in both the 1969 and 1974 versions of DR 5-105(D) did not directly address conflicts of interest arising when a personally disqualified lawyer joins a firm that would not otherwise be disqualified. However, when this issue reached the courts, most state and federal courts invoked the imputed disqualification doctrine, citing DR 5-105(A) & (D), DR 4-101 (the preservation of a client's confidences and secrets), and Canon 9 (the avoidance of an appearance of impropriety). These decisions were not well received in some quarters of the legal profession who believed that the 1974 version of DR 5-105(D) was much too broad and that it gave too much leeway to the courts.[38] Accordingly, these lawyers set out to find a remedy for their predicament and eventually decided that internal screening arrangements similar to those used by financial institutions to prevent internal communication between departments could be adapted for use by the legal profession.[39] In theory, these internal screening arrangements would insulate the rest of the firm from the personally conflicted lawyer and would thereby provide evidence sufficient to rebut the presumption of shared confidences.

One year after the 1974 amendment to DR 5-105(D), the American Bar Association, following intensive lobbying by Washington and New York law firms,[40] modified its traditional stance regarding imputed disqualification. Citing the government's need for competent lawyers, the ABA's Committee on Ethics and Professional Responsibility approved the use of screening arrangements for former government lawyers even though the Code of Professional Responsibility did not mention the use of screening arrangements. *See* ABA Committee on Ethics and Professional Responsibility, Formal Op. 342 (1975). Two years later, the United States Court of Claims followed Formal Op. 342, *see Kesselhaut v. United States*, 555 F.2d 791, 793 (Ct. Cl. 1977), and within several years, the federal courts began

to view Formal Op. 342 as an amendment to the Code of Professional Responsibility. *See* Fields, *supra* note 11, at 243.

Even though the reasoning of Formal Op. 342 and *Kesselhaut v. United States* has been questioned,[41] the approval of the use of screening arrangements for former government lawyers emboldened the proponents of screening arrangements, and they continued to press forward on two fronts to gain approval of screening arrangements for lawyers in private practice. First, they continued their efforts to persuade the courts that evidence of the prompt use of screening arrangements should rebut the presumption of shared confidences. Second, they set out to amend the ethics rules to include provisions explicitly approving the use of screening arrangements in the private sector. As matters currently stand, the efforts to amend the ethics codes have borne more fruit than the efforts to convince courts that screening arrangements are the panacea for imputed disqualification problems.

## C.
### Changes in the Ethics Codes

The first modern effort to rewrite the profession's ethics codes began in 1977 when the American Bar Association created the Commission on the Evaluation of Professional Standards (commonly known as the "Kutak Commission") and ended in 1983 with the adoption of the Model Rules of Professional Conduct. The Kutak Commission eventually concluded that nothing less than a comprehensive reformulation of the ethical standards of the legal profession was called for. Between 1979 and 1982, the Kutak Commission produced four major drafts of new ethics rules that entirely reworked the structure and substance of the Code of Professional Responsibility.[42] Rather than reflecting consensus, these drafts prompted controversy and dissent. In fact, two other professional organizations produced competing ethics codes.[43] The range of opinions regarding the appropriate standards for the profession reflected the ethical pluralism among the members of the bar.[44]

Two matters taken up in the process of adopting the Model Rules of Professional Conduct are relevant to this appeal. First, both the Kutak Commission and the House of Delegates decided that Canon 9's "appearance of impropriety" standard that had figured so prominently in the development of the imputed disqualification rule was too indefinite.[45] Accordingly, the Model Rules of Professional Conduct explicitly reject the "appearance of impropriety" standard as " subjective" and "question-begging." *See* ABA Model Rules of Professional Conduct Rule 1.10 cmt. (Lawyers Moving Between Firms; third paragraph) (1983).

The second issue germane to this case involves the use of screening arrangements by lawyers in private practice to avoid the consequences of the imputed disqualification doctrine. The Kutak Commission's initial discussion draft issued in January 1980 did not explicitly address the imputed disqualification doctrine or the use of screening arrangements; however, the draft considered at the American Bar Association's February 1983 meeting did. By this time, proposed Rule 1.10 had been rewritten to address imputed disqualification directly.[46] The Commission added Comment No. 11 to Rule 1.10 containing factors for the courts to consider in determining whether imputed disqualification was required in a particular case. One of the factors was "the nature and probable effectiveness of screening measures."[47] Thus, this version of the proposed Code, at least implicitly, allowed lawyers in private practice to use screening arrangements.[48]

Proposed Rule 1.10 and its comments were rewritten between the House of Delegates' February 1983 and May 1983 meetings. The Commission replaced the original Section 1.10(b) with a new Section 1.10(b) dealing with lawyers becoming associated with a firm and with a new Section 1.10(c) dealing with lawyers terminating their association with a firm.[49] The Commission also deleted the comment containing the factors for determining whether to invoke the imputed disqualification rule.[50]

The Model Rules of Professional Conduct adopted by the American Bar Association's House of Delegates in August 1983 differed significantly from the original Kutak Commission proposals. Ultimately, both the Kutak Commission and the American Bar Association rejected the use of screening mechanisms for private lawyers but approved their use for former government lawyers, just as Formal Op. 342 had done nine years earlier.[51] However, the comments to the 1983 version of Rule 1.10 imply that mandatory imputed disqualification is not the answer in every case and that the courts should decide these questions on a case-by-case basis and that the presumption of shared confidences should be tempered by the personally conflicted lawyer's actual role in the present and former firm and his or her actual knowledge of privileged information.[52]

The American Bar Association's reconsideration of professional ethics did not end with the adoption of the Model Rules of Professional Conduct. These rules have been amended twenty-eight times since their adoption in 1983. *See* Ann. Model Rules of Professional Conduct, *supra* note 45, at vii. Amendments adopted in 1989 moved several provisions in original Rule 1.10(b) and the corresponding comments to Rule 1.09 and broadened Rule 1.9(c). *See* Ann. Model Rules of Professional Conduct, *supra* note 45, at 579. In their present form, Rules 1.9 and 1.10 (and Rule 1.11 dealing with former government lawyers) depart significantly from the form and substance of the Code of Professional Responsibility. They tailor the imputed disqualification rules to particular conflicts of interest situations that require firm disqualification because of a specific danger of conflicting representation by other members of the firm. *See* Wolfram, *supra* note 33, § 7.6.2, at 395. They also envision that a lawyer joining a firm should be deemed to carry his or her actual knowledge only and that the new firm's status should be decided accordingly. *See* Hazard & Hodes, *supra* note 33, § 1.1:207, at 335-36.

The efforts to amend the ethics rules to include explicit approval for screening arrangements proved to be more successful in the context of the drafting and approval of the American Law Institute's Restatement (Third) of the Law Governing

Lawyers. Section 204(2) of the Restatement, approved on May 12, 1998, permits private law firms to use screening arrangements to avoid the application of the imputed disqualification doctrine. Following the final approval of the Restatement, the American Bar Association announced the creation of the Commission on the Evaluation of the Rules of Professional Conduct (popularly known as "Ethics 2000") to evaluate the Model Rules of Professional Conduct in light of the variations in the rules as adopted at the state level and the provisions in the Restatement.[53] The Ethics 2000 Commission has already circulated proposed revisions to the comments associated with Rule 1.10 regarding the use of screening arrangements for non-lawyer support personnel and lawyers. These proposals would permit the use of screening arrangements for non-lawyer support personnel who change jobs and for new lawyers who worked at an opposing law firm as law clerks but would not permit the use of screening arrangements to cure conflicts of interest created when a personally disqualified lawyer changes firms. *See* Current Reports, Laws. Man. on Prof Cond. (ABA/BNA) 259 (June 9, 1999).

Even as the American Bar Association and the American Law Institute considered the propriety of screening arrangements for lawyers in private practice, several states amended their ethics rules to permit the use of screening arrangements. To date, six jurisdictions have amended their ethics rules to approve the use of screening arrangements by private lawyers.[54] One jurisdiction has approved the use of screening arrangements by law students and lawyers affiliated with the law school's legal clinic.[55] Another jurisdiction has not specifically approved the use of the screening arrangements but has adopted the draft comments to ABA Model Code of Professional Conduct Rule 1.10 listing screening arrangements among the factors that the court should consider when determining whether to invoke the imputed disqualification doctrine.[56]

In three jurisdictions that have not amended their ethics rules, administrative disciplinary bodies have issued opinions approving the use of screening arrangements. Like Tennessee Board of Professional Responsibility's Formal

Ethics Op. 89-F-118 (Mar. 10, 1989), the Ohio Board of Commissioners on Grievances and Discipline has approved the use of screening arrangements by members of the private bar. *See* Ohio Bd. of Comm'rs on Grievances and Discipline Advisory Op. 89-013 (May 30, 1989), 1989 WL 535018 (OhioBd.Comm.Griev.Disp.); Hamilton & Coan, *supra* note 20, at 82-83 n.105. Another jurisdiction's ethics advisory committee has approved the use of screening arrangements but only when the former client has approved the former lawyer's new firm's representation of the adverse party. *See* S.C. Bar Ethics Adv. Comm. Op. 92-23 (Oct. 1992), 1992 WL 810439 (S.C.Bar.Eth.Adv.Comm.).

## D.
### The Courts' Response to the Imputed Disqualification Doctrine and to Screening Arrangements

Most courts currently employ a three-step approach to imputed disqualification issues. The first step involves determining whether a substantial relationship exists between the subject matter of the former representation and the subject matter of the subsequent adverse representation. The second step involves determining whether the lawyer who has changed firms is personally disqualified under the applicable conflict of interest rules. The third step involves determining whether the lawyer's new firm must also be disqualified from representing the party with an interest adverse to the interests of the personally conflicted lawyer's former client.

The "substantial relationship" inquiry is universally accepted as the starting point for the disqualification analysis.[57] While it has several formulations, the inquiry examines (1) the scope of the former representation, (2) whether it is reasonable to infer that confidential information would have been given to a lawyer representing a client in such matters, and (3) whether the information is relevant to the issues being raised in the litigation pending against the former client. *See LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252, 255-56 (7th Cir. 1983). If the court finds that there is

no substantial relationship between the subject matter of the former and present representations, the inquiry ends because there can be no conflict of interest between the lawyer and his or her former client or between the former client and the lawyer's new law firm. If, however, the court finds that a substantial relationship exists, then the court must determine whether the lawyer should be disqualified.

There are two bases for disqualifying the lawyer if the court finds a substantial relationship between the subject matter of the present and former representations. First, the lawyer could be disqualified if he or she has a primary conflict of interest resulting from the lawyer's direct exposure to the former client's confidential information. Second, the lawyer, like the rest of the lawyer's former firm, could be disqualified if he or she has a secondary conflict of interest arising from the presumption of shared confidences.

A majority of courts hold that the presumption of shared confidences with regard to the information received by the lawyer's former firm is irrebuttable once a substantial relationship between the present and former representations has been established. *See Arkansas v. Dean Foods Prods. Corp.*, 605 F. 2d 380, 384-85 (8th Cir. 1979), *overruled on other grounds by In re Multi-Piece Rim Prods. Liab. Litigation*, 612 F.2d 377, 378 (8th Cir. 1980); *Emle Indus. v. Pantentex, Inc.*, 478 F.2d 562, 570-71 (2d Cir. 1973); *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1536 (D. Kan. 1992).[58] Other courts have held that the presumption can be rebutted if the lawyer shows that he or she was not privy to any confidential information. This approach is not widely accepted and has generally been followed only in cases involving associates of large firms who performed minor tasks such as researching points of law. *See Silver Chrysler Plymouth, Inc. v. Chysler Motors Corp.*, 518 F.2d 751, 756-57 (2d Cir. 1975) (differentiating between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery); Ann. Model Rules of Conduct, *supra* note 45, at 157-59; Bateman, *supra* note 8, at 253.

Once the party seeking disqualification establishes a prima facie case, the burden of proof shifts to the lawyer and the firm whose disqualification is sought to demonstrate why they should not be disqualified. *See SLC Ltd. v. Bradford Group West, Inc.*, 999 F.2d 464, 468 (10th Cir. 1993); *Norman v. Norman*, 970 S.W.2d 270, 274 (Ark. 1998); *Koulisis v. Rivers*, 730 So. 2d 289, 292 (Fla. Dist. Ct. App. 1999); *Heringer v. Haskell*, 536 N.W.2d 362, 365 (N.D. 1995); Hazard & Hodes, *supra* note 33, § 1.10:208, at 338.5. This rebuttal effort should not force either party to reveal the former client's confidential information. *See* Wolfram, *supra* note 33, § 7.6.3, at 399; Fields, *supra* note 11, at 237. Any doubts regarding the existence of an asserted conflict of interest should be resolved in favor of disqualification. *See Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir. 1978); *Koulisis v. Rivers*, 730 So. 2d at 292; *Angleton v. Estate of Angleton*, 671 N.E.2d 921, 928 (Ind. Ct. App. 1996); *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 123 (Nev. 1998); *Herbert v. Haytaian*, 678 A.2d 1183, 1189 (N.J. Super. Ct. App. Div. 1996); *Burkes v. Hales*, 478 N.W.2d 37, 41 (Wis. Ct. App. 1991).

If there is a substantial relationship between the former and present representations and if the lawyer who has changed firms is personally disqualified from representing the present client because of a conflict of interest regarding the former client, then the final step of the analysis is to determine whether the lawyer's new firm should be disqualified by implication. For those courts following the traditional view that the presumption of shared confidences is irrebuttable, imputed disqualification of the new firm is mandatory. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 33 (1931); ABA Model Code of Professional Responsibility DR 5-105(D); ABA Model Rules of Professional Conduct § 1.10(b) (1983); Bateman, *supra* note 8, at 254, 266 n.105; Fields, *supra* note 11, at 236-37 n. 36. Other courts, believing that mandatory imputed disqualification casts an unnecessarily wide shadow, are reluctant to invoke the doctrine to disqualify the new law firm except as a last resort. For these courts, the presumption of shared confidences among the lawyer and his or her associates at the new firm is rebuttable. *See Freeman v. Chicago Musical Instrument Co.*, 689 F.2d

715, 722-23 (7th Cir. 1982).

Courts viewing the presumption of shared confidences as rebuttable must balance the former client's legitimate right to be free from apprehension that its confidential information will be revealed with the party's interest in choosing his or her own lawyer and with the former lawyer's interest in following his or her career path to its best advantage. *See Barragree v. Tri-County Elec. Co-op, Inc.*, 950 P.2d 1351, 1357 (Kan. 1997); *Gellman v. Hilal*, 607 N.Y.S.2d 853, 855 (Sup. Ct. 1994). In this balancing process, the first client's right to preserve its confidential information is entitled to greater weight than the later client's right to retain counsel of its own choosing, *see Donohoe v. Consolidated Operating & Prod. Corp.*, 691 F. Supp. 109, 118 (N.D. Ill. 1988); *State ex rel. FirstTIER Bank, N.A., v. Buckley*, 503 N.W.2d 838, 842 (Neb. 1993), as well as the employment and staffing interests of the incoming lawyer and the new law firm. *See Kala v. Aluminum Smelting & Refining Corp.*, 688 N.E.2d at 267 (holding that a law firm may be required to subordinate its desire to augment its staff to its duties to its clients).

Law firms seeking to avoid the effect of the imputed disqualification rule must prove their case by clear and effective proof. *See Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d at 723; *Nelson v. Green Builders, Inc.*, 823 F. Supp. 1439, 1448 (E.D. Wis. 1993); *State v. Tate*, 925 S.W.2d at 557-58. As a general matter, law firms have attempted to rebut the presumption of shared confidences in two ways. In jurisdictions governed by a version of the Model Rules of Professional Conduct, firms undertake to prove that the moving lawyer did not have a primary conflict of interest resulting from his or her direct receipt of confidential information from a former client of the former firm.[59] *See Trustco Bank of N.Y. v. Melino*, 625 N.Y.S.2d 803, 806-07 (Sup. Ct. 1995); Hazard & Hodes, *supra* note 33, § 1.10:208; Bateman, *supra* note 8, at 268. Law firms have also sought to avoid the effects of the imputed disqualification rule through the use of screening arrangements. *See Schiessle v. Stephens*, 717 F.2d at 421; Bateman, *supra* note 8, at 254; Penegar, *supra* note 9, at 859. Because

screening arrangements are now generally accepted when a private firm employs a former government lawyer, these law firms assert that there is no substantive difference between lawyers moving from government to the private sector and lawyers moving between private firms. *See Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d at 226; Ann. Model Rules of Professional Conduct Rule 1.9, *supra* note 45, at 159.

The use of screening arrangements for lawyers moving from one private firm to another remains highly controversial, *see* Hamilton & Coan, *supra* note 20, at 59, and has not been approved by a majority of the courts that have been squarely presented with the issue. Currently, United States Courts of Appeals for four circuits,[60] five United States District Courts,[61] and courts in six states[62] have approved the private sector use of screening arrangements. At the same time, United States Courts of Appeal in five circuits have declined to approve screening arrangements.[63] Likewise, United States Court of Appeals in two circuits,[64] eight United States District Courts,[65] and courts in ten states[66] have rejected the use of screening arrangements for lawyers in private practice. Two state courts have declined to approve screening arrangements.[67]

## V.

## Imputed Disqualification in Tennessee

Tennessee is one of the few remaining jurisdictions whose ethics rules for the legal profession are based on the American Bar Association's Model Code of Professional Responsibility. The Tennessee Supreme Court adopted an amended version of this code in 1970. While the Court has amended the code on nine occasions to accommodate developments such as IOLTA, legal specialization, and lawyer advertising, the form and substance of the code has remained essentially unchanged for the past thirty years.

While the provisions of the Code of Professional Responsibility applicable to

this case have remained unchanged, the Board of Professional Responsibility's interpretation of them has not. In 1981, broadly construing Tenn. S. Ct. R. 8, DR 5-105(D), the Board opined that "[w]hen an attorney is barred from representation on the ground of knowledge actually or presumably acquired from a former representation, then the entire firm is similarly barred." Tenn. Bd. of Professional Responsibility, Formal Op. 81-F-5 (Apr. 17, 1981), 1981 WL 165063 (Tenn.Bd. Prof.Resp). Six years later, the Board, citing its earlier opinion, disapproved of the use of screening arrangements for paralegals who moved from one opposing firm to another. *See* Tenn. Bd. of Professional Responsibility, Formal Op. 87-F-110 (June 10, 1987), 1987 WL 364064 (Tenn.Bd.Prof.Resp.). Three months later, the Board appeared to apply a more relaxed rule to district attorney generals' offices. In keeping with the accepted recognition of differences between lawyers in public service and those in private practice, the Board stated that imputed disqualification should be considered on a case-by-case basis when a member of a district attorney general's staff formerly represented a defendant. *See* Tenn. Bd. of Professional Responsibility, Formal Op. 87-F-111 (Sept. 16, 1987), 1987 WL 364065 (Tenn.Bd.Prof.Resp.).

In 1988, the United States Court of Appeals for the Sixth Circuit held that screening arrangements provided private law firms with the same protection from imputed disqualification when they hired a lawyer in private practice that it provided when they hired a former government lawyer. *See Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d at 225. Rather than finding support for its conclusion in the provisions of Tennessee's version of the Code of Professional Responsibility which governed the conduct of the lawyers in the case, the court based its opinion on provisions of the ABA Model Rules of Professional Conduct and on decisions by the United States Court of Appeals for the Seventh Circuit.

The *Manning* decision prompted another request for a formal ethics opinion regarding the efficacy of screening arrangements by Tennessee lawyers. On this occasion, the Board of Professional Responsibility reversed itself and overruled

Formal Opinions 81-F-5 and 87-F-110. Without addressing Tenn. S. Ct. R. 8, DR 5-105(D), the Board found that the presumptions of shared confidences at an attorney's new firm could be rebutted by proof that the attorney's new firm had instituted appropriate screening arrangements. *See* Tenn. Bd. of Professional Responsibility, Formal Op. 89-F-118.[68] The Board also stated that screening arrangements could be used for lawyers, law clerks, paralegals, and legal secretaries.

Tennessee's intermediate appellate courts have taken different paths with regard to imputed disqualification and the efficacy of screening mechanisms. This difference can be explained, at least in part, by the distinction between lawyers in government service and those in private practice and by the difference between criminal proceedings and civil proceedings. The cases reflect an understanding that applying the imputed disqualification doctrine to district attorney generals' offices in the same way that it is applied to private law firms would seriously hamper the prosecution of criminal cases. *See State v. West*, No. 01C01-9107-CC-00202, 1992 WL 62020, at *2 (Tenn. Crim. App. Mar. 31, 1992), *perm. app. dismissed*, (Tenn. July 13, 1992).

In the earliest reported imputed disqualification case, the Tennessee Court of Criminal Appeals declined to disqualify a district attorney general and his entire staff because one assistant district attorney had peripherally represented the defendants while employed as a staff attorney at the University of Tennessee Legal Clinic. Without much discussion, the court held that while the assistant district attorney general formerly employed at the legal clinic should be disqualified, the remaining members of the district attorney general's office were not disqualified. *See Mattress v. State*, 564 S.W.2d 678, 679-80 (Tenn. Crim. App. 1977). Seven years later, the court reversed a second degree murder conviction because the defendant's former lawyer switched sides and assisted the prosecution of the defendant as an assistant district attorney general. In its remand order, the court disqualified not just the assistant but also the district attorney general's entire staff. *See State v. Phillips*, 672 S.W.2d at 436.

In 1992, the Court of Criminal Appeals, adopting Formal Op. 89-F-118, held that a district attorney general could avoid the imputed disqualification of the entire office by proving "by clear and convincing evidence that the challenged attorney has been sufficiently screened from the remainder of the staff and its work on the pending case." *See State v. Claybrook*, 1992 WL 17546, at *11. After the *Claybrook* decision, the court has consistently declined to disqualify a district attorney general's entire staff when timely screening arrangements have been instituted[69] and has reversed convictions when they have not.[70]

The Court of Appeals has had less occasion to confront imputed disqualification issues than the Court of Criminal Appeals. The first case presenting the issue involved a divorce proceeding in which the secretary of a lawyer representing the wife took a job with the lawyer representing the husband. The court reversed the trial court's disqualification of the husband's lawyer on two grounds. First, a majority of the court announced that "[n]o Supreme Court Rule or Statute is cited or found which forbids a lawyer to hire a former secretary of a lawyer who opposes him in a lawsuit." Second, the court found that no evidence had been presented that the secretary had shared any of the wife's confidential information with the husband's lawyer. *See King v. King*, 1989 WL 122981, at *9. The majority of the court downplayed the significance of both Formal Op. 89-F-118 and screening arrangements by observing that the ethics opinion was not binding on the courts and that use of screening arrangements had not been made part of Tenn. S. Ct. R. 8. *See King v. King*, 1989 WL 122981, at *10.

The court never reached the issue of screening arrangements in the second case raising the issue of imputed disqualification. The case was an encroachment action in which one property owner moved to disqualify the lawyer representing the neighboring property owner because one of the lawyer's partners had represented the moving party when she bought the property at auction. Both the trial court and the appellate court declined to disqualify the lawyer after finding that there was no

substantial relationship between the closing and the later encroachment action and that the party seeking the disqualification had not divulged any confidential information during or before the closing. *See Lemm v. Adams*, 955 S.W.2d 70, 75 (Tenn. Ct. App. 1997).

The most recent case considered by the Court of Appeals required the court to consider the efficacy of screening arrangements established when a lawyer representing one of the defendants in a medical malpractice action left his firm to start a new firm with the lawyers representing the plaintiffs in the same case. Before the lawyer left his old firm, he requested that he be insulated from any further activities in the case. He also reached an understanding with his new partners that they would institute screening arrangements to isolate him from the case.[71] Despite these screening arrangements, the trial court disqualified the law firm representing the plaintiffs because the small size of the firm rendered screening ineffective. The court's decision to affirm the trial court's disqualification order rested on Tenn. S. Ct. R. 8, Canon 9. The court stated:

> In the case before us, the lawyers carefully planned their joinder – a calculated and deliberate act with full knowledge that Pierce possessed the most intimate confidence of his client concerning the case. They argue that the screening procedures rebut the presumption of Pierce sharing these confidences. The new firm is small, and we hope the firm has the collegiality that typifies the brotherhood[72] of the profession. In such an atmosphere, it is certainly conceivable that at best inadvertent references to the case could crop up from time to time. Who knows what effects such references might have on plaintiffs' lawyers in perhaps following some lead that was innocently, perhaps, fostered by some comment made without any improper motive. Leaving aside the possibility of divulged confidences, we are still faced with the appearance of impropriety. As in the *Penn Mutual* case,[73] the lawyers in the case before us "switched sides."
>
> We . . . believe that Canon 9 is essential to engender, protect, and preserve the trust and confidence of the client. In the case before us with these peculiar facts, we cannot say that the trial court erred in disqualifying plaintiffs'

> lawyers from further participation in the case. The profession demands, and the public deserves, no less.

*Watson v. Ameredes*, No. 03A01-9704-CV-00129, 1997 WL 772865, at *6-7 (Tenn. Ct. App. Dec. 10, 1997) (No Tenn. R. App. P. 11 application filed).

## VI.

Disqualifying a party's lawyer is a drastic remedy that should be used sparingly. *See Lemm v. Adams*, 955 S.W.2d at 74; *Hilton v. Crawford*, No. 03A01-9101-CV-00033, 1991 WL 261872, at *3 (Tenn. Ct. App. Dec. 13, 1991) (No Tenn. R. App. P. 11 application filed). The courts should carefully and critically scrutinize disqualification motions because of (1) their disruptive effect on the trial process,[74] (2) their interference with a party's right to retain counsel of their own choosing, and (3) the legitimate concern that the motion is filed simply to gain a tactical advantage at trial.[75] Thus, the courts should be reluctant to disqualify a party 's lawyer and should do so only when no other satisfactory remedy exists. *See Whalley Dev. Corp. v. First Citizens Bancshares, Inc.*, 834 S.W.2d 328, 331-32 (Tenn. Ct. App. 1992); *In re Ellis*, 822 S.W.2d at 605.

No bright-line tests exist for making disqualification decisions when a lawyer has received confidential information. *See In re Meador*, 968 S.W.2d 346, 351 (Tex. 1998). These decisions should be made on a case-by-case basis in light of the facts of the particular case. *See Watson v. Ameredes*, 1997 WL 772865, at *4; *State v. Tate*, 925 S.W.2d at 557. Because these decisions are fact-driven, it is preferable for the trial court to conduct an evidentiary hearing rather than making a decision based only on affidavits. *See Chrispens v. Coastal Ref'g & Mktg., Inc.*, 897 P.2d 104, 116 (Kan. 1995); *Piette v. Bradley & Leseberg*, 930 P.2d 183, 184 (Okla. 1996).

Decisions regarding disqualification are discretionary and are thus entitled to deference on appeal. *See Rust v. Gerbman*, No. 01A01-9608-CH-00361, 1997 WL

266844, at *6 (Tenn. Ct. App. May 21, 1997) (No Tenn. R. App. P. 11 application filed); *State v. Tate*, 925 S.W.2d at 549-50; *State v. Phillips*, 672 S.W.2d at 431. However, when the facts are essentially undisputed, the trial courts are no better suited than the appellate courts to construe the ethics rules. Thus, the appellate courts are not required to defer to a trial court's interpretation of the Code of Professional Responsibility or to its decisions regarding the legal standards applicable to a particular disqualification motion. *See In re Ellis*, 822 S.W.2d at 606.

Both intermediate appellate courts and the Board of Professional Responsibility have determined that the three-part test fashioned by the United States Court of Appeals for the Seventh Circuit in *Schiessle v. Stephens* is an appropriate method for addressing imputed disqualification questions. *See Lemm v. Adams*, 955 S.W.2d at 74; *State v. Tate*, 925 S.W.2d at 557-58; *State v. Claybrook*, 1992 WL 17546, at *10; Tenn. Bd. of Professional Responsibility, Formal Op. 89-F-118. This approach requires the courts to consider the three questions. The threshold question is whether a substantial relationship exists between the present and the former representation. If a substantial relationship exists, the second and third questions are whether the presumption of shared confidences with respect to the former representation has been rebutted and whether the presumption of shared confidences with respect to the current representation has been rebutted. *See Schiessle v. Stephens*, 717 F.2d at 420.

While courts in other jurisdictions differ concerning the criteria for determining whether a substantial relationship exists between the former and present representation, we need not address this issue in this case because the undisputed facts lead to no conclusion other than that there is a substantial relationship between the present and former representation. They are, in fact, the same case. An affirmative answer to this threshold question would normally give rise to the presumption that a lawyer was privy to the confidences and secrets of clients of his or her former firm. However, under the facts of this case, we need not rely on the

presumption because it is undisputed that Mr. Davis was the Blackwoods' attorney of record in this case and that he obtained privileged information from them in order to prepare their answer and counterclaim against the Clinards. Accordingly, the answers to the first two questions of the *Schiessle* analysis favor the Blackwoods' recusal motion.

If the presumption of shared confidences were irrebuttable, our inquiry would end here because Tenn. S. Ct. R. 8, DR 5-105(D) would require the imputed disqualification of the entire Waller firm because of Mr. Davis's direct, personal conflict of interest. However, for the purposes of this appeal, we will assume that the presumption of shared confidences at a lawyer's new firm is rebuttable even though the Tennessee Supreme Court has not yet decided the issue. Virtually all intermediate appellate court decisions addressing the imputed disqualification issue during the past ten years have held the presumption of shared confidences between a lawyer and his or her new firm is rebuttable. Thus, the question becomes whether evidence that a private firm has employed internal screening arrangements will suffice to rebut the presumption in every case. The answer to this question is no.

Even though we share many of the expressed qualms regarding screening arrangements,[76] we will assume for the sake of this opinion that a properly instituted and maintained screening arrangement can provide evidence to rebut the presumption of shared confidences in certain circumstances. Thus, the questions to be answered are under what circumstances will screening arrangements have the desired effect and for which lawyers may screening arrangements be used.

The prevailing view, and the view that most appropriately balances the competing interests when an imputed disqualification issue surfaces, is that a screening arrangement may be used to prevent the disqualification of a law firm only when the personally conflicted lawyer was superficially involved with the former client. In this circumstance, the risk of intentional or inadvertent disclosure of confidential information that could materially prejudice a former client is greatly

minimized. This view furthers clients' legitimate expectations that their lawyer will protect their confidences and secrets[77] and that their lawyer will represent them with undivided loyalty within the bounds of the law.[78] This view is also implicit in both the ABA Model Rules of Professional Conduct Rules 1.09, 1.10[79] and Restatement (Third) of the Law Governing Lawyers § 204(2) (Proposed Final Draft No. 1 1996).[80]

Under the prevailing view, which is also consistent with *Watson v. Ameredes*, the Waller firm's use of a screening arrangement to shield the rest of the firm from Mr. Davis and his secretary does not suffice to prevent the operation of the imputed disqualification rule. Mr. Davis has not been on the periphery of representing the Blackwoods. They were former clients whom he actively represented from 1973 through August 1996. He actually represented the Blackwoods in the very case in which Waller, Lansden, Dortch and Davis is now representing their adversaries. During Mr. Davis's representation of the Blackwoods in this case, which lasted from March through August 1996, the Blackwoods provided Mr. Davis with confidential information directly relevant and material to both their defense against the Clinard's boundary line complaint, their counterclaims against the Clinards and their third-party claims against American Limestone.

The Blackwoods were the ones required to retain a new lawyer in 1996 when Mr. Davis withdrew after another client of his firm declined to permit him to continue to pursue the Blackwoods' legal remedies. After they retained a new lawyer, they discovered that Mr. Davis had joined the law firm that was representing their adversaries in the same case in which he had once been their attorney of record. Mr. Davis never informed the Blackwoods that he was negotiating a return to the Waller firm, made no effort to obtain their consent, and provided them with no assurance in advance that his return to the Waller firm would not materially affect their claims and defenses in the dispute with the Clinards and American Limestone. Under these circumstance, the Blackwoods' perception that Mr. Davis had essentially "switched sides" in the litigation is not unfounded or unreasonable.

Our resolution of this appeal must track the Code of Professional Responsibility as enacted in Tennessee rather than the provisions of the ABA Model Rules of Professional Conduct which have not yet even been considered by the Court. Thus, Tenn. S. Ct. R. 8, Canon 9, even if disfavored by some factions of the organized bar, remains an important factor when addressing imputed conflict of interest issues. *See Watson v. Ameredes*, 1997 WL 772865, at * 6-7; *State v. Tate*, 925 S.W.2d at 555.[81] As one experienced federal trial judge recently noted, "[i]n an age of sagging public confidence in our legal system, maintaining confidence in that system and the legal profession is of utmost importance." *Roberts & Schaefer Co. v. San-Con, Inc.*, 898 F. Supp. at 363. This settled purpose was recently echoed by Judge Crawford when he noted that it is essential for the courts to "engender, protect, and preserve the trust and confidence of the client." *Watson v. Ameredes*, 1997 WL 772865, at *7.

Based on the facts of this case and for the reasons stated herein, we find that the Waller firm's use of screening arrangements with regard to Mr. Davis and his secretary was not sufficient to rebut the presumption of shared confidences between Mr. Davis and the other members of the Waller firm with the regard to the pending litigation between the Blackwoods and the Clinards and American Limestone. Accordingly, the trial court erred by denying the Blackwoods' motion to disqualify the Waller firm from continuing to represent the Clinards and American Limestone in this case.

## VII.

We vacate the order denying the Blackwoods' motion to disqualify the firm of Waller, Lansden, Dortch & Davis in this case and remand the case to the trial court with directions to enter an order disqualifying the firm. We tax the costs of this appeal to Waller, Lansden, Dortch & Davis for which execution, if necessary, may issue.

_____        WILLIAM C. KOCH, JR., JUDGE


CONCUR:


_____
BEN H. CANTRELL, JUDGE


_____
WILLIAM B. CAIN, JUDGE